**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**36 CFR Part 242**

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 100**

[FWS–R7–SM–2008–0052; 70101–1335–0064L6]

**Subsistence Management Regulations for Public Lands in Alaska; Federal Subsistence Regional Advisory Council Membership**

**AGENCIES:** Forest Service, Agriculture; Fish and Wildlife Service, Interior.
**ACTION:** Reaffirmation of current regulations.

**SUMMARY:** This document describes the membership makeup of Federal subsistence regional advisory councils established under subsistence management regulations. This document is the final step in an administrative action with respect to those regulations, made necessary because of an order entered by the U.S. District Court for Alaska. The U.S. District Court order made it necessary to give further consideration to alternative methods for assuring balance in membership for regional advisory councils and to provide a complete and thorough administrative record.

**FOR FURTHER INFORMATION CONTACT:** Chair, Federal Subsistence Board, c/o U.S. Fish and Wildlife Service, Attention: Peter J. Probasco, Office of Subsistence Management; (907) 786–3888. For questions specific to National Forest System lands, contact Steve Kessler, Regional Subsistence Program Leader, USDA, Forest Service, Alaska Region, (907) 786–3592.

**SUPPLEMENTARY INFORMATION:**

**Background**

Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA) (16 U.S.C. 3111–3126) requires the Secretaries of the Interior and Agriculture to implement a program to grant a preference for subsistence uses of fish and wildlife resources on Federal public lands and waters, unless the State of Alaska enacts and implements laws of general applicability that are consistent with ANILCA and that provide for the subsistence definition, preference, and participation specified in Sections 803, 804, and 805 of ANILCA. The State implemented a program that the Department of the Interior found to be consistent with ANILCA. However, in December 1989, the Alaska Supreme Court ruled in *McDowell* v. *State of Alaska* that the rural preference in the State subsistence statute violated the Alaska Constitution. The Court's ruling in *McDowell* required the State to delete the rural preference from the subsistence statute and, therefore, negated State compliance with ANILCA.

As a result of the *McDowell* decision, on July 1, 1990, the Department of the Interior and the Department of Agriculture (Departments) assumed responsibility for implementation of Title VIII of ANILCA on Federal public lands and waters pursuant to temporary subsistence management regulations that were published on June 29, 1990 (55 FR 27114). The Departments published final regulations in the **Federal Register** (57 FR 22940, May 29, 1992). On January 8, 1999 (64 FR 1276), the Departments published a final rule to extend jurisdiction to include certain waters in which there exists a Federal reserved water right in order to conform the Federal Subsistence Management Program to the Ninth Circuit Court's ruling in *Alaska* v. *Babbitt*, 72 F. 3d 698 (1995).

The subsistence management regulations, as revised January 8, 1999 (64 FR 1276), established a Federal Subsistence Board (Board) to administer the Federal Subsistence Management Program. The Board's composition consists of a Chair appointed by the Secretary of the Interior with concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; the Alaska Regional Director, U.S. National Park Service; the Alaska State Director, U.S. Bureau of Land Management; the Alaska Regional Director, U.S. Bureau of Indian Affairs; and the Alaska Regional Forester, U.S. Forest Service. Through the Board, these agencies participate in the development of the Federal subsistence management regulations. Because these regulations are jointly administered by the Departments, they are found in two titles (36 and 50) of the Code of Federal Regulations.

**Federal Subsistence Regional Advisory Councils**

The Federal subsistence management regulations divide Alaska into 10 subsistence resource regions, each of which is represented by a Federal subsistence regional advisory council (councils) (36 CFR 242.11 and 50 CFR 100.11). The councils provide a forum for the residents of the particular region with personal knowledge of local conditions and resource requirements to have a meaningful role in the subsistence management of fish and wildlife on Alaska Federal public lands and waters as described in ANILCA Sections 801 and 805.

The Board reviews applications for membership on the councils and makes recommendations to the Secretaries on the appointments to the councils. The appointments themselves are then made by the Secretary of the Interior with the concurrence of the Secretary of Agriculture. The council members represent varied geographical areas, cultures, interests, and resource users within each region. A council member must be a resident of the region in which he or she is appointed, have knowledge of the fish and wildlife resources in that region, and have knowledge of the subsistence uses of that region.

**Litigation**

In 1998, Safari Club International and others filed suit in the U.S. District Court for the District of Alaska. This suit, among other things, contended that the membership on the councils was not balanced as required by the Federal Advisory Committee Act (FACA) of 1972, Public Law 92–463, 86 Stat. 770 (*Safari Club* v. *Demientieff*, No. A98–0414–CV). In the meantime, the Secretary of the Interior, as part of a national review of advisory committees and in response to inquiries related to the Federal subsistence regional advisory councils in Alaska, independently requested that the Board examine its process for selecting nominees, and "see that" groups such as "residents of non-rural areas, commercial users of fish and wildlife resources and sportsmen are represented on the councils." Based on Board recommendations following that in-depth examination, the Secretary of the Interior, with concurrence of the Secretary of Agriculture, in November 2003 increased the size of nine of the councils; established the goal of making appointments to the councils so as to achieve, where possible, a representation goal of 70 percent subsistence users and 30 percent sport and commercial users; revised the application/evaluation/selection process and forms; and approved a 3-year implementation period.

The Native Village of Venetie Tribal Government and others were permitted to intervene in the Safari Club case and to challenge the 70/30 ratio representational goals established by the Secretaries. In January 2004, the U.S. District Court for Alaska entered an order recognizing that, with respect to

EXHIBIT 1
Page 1 of 5

the councils, "a council comprised of only subsistence users is not fairly balanced. Subsistence users are not the only persons directly affected by regional advisory council recommendations and subsistence users are not the only persons who might be interested in the management of fish and wildlife on federal lands. * * * Non-subsistence users of fish and wildlife are directly affected by management of fish and wildlife for subsistence uses and have a legitimate interest in the proper scientific management of same. * * * While all points of view and all persons directly affected are not entitled to representation on a FACA committee, in this instance, a cross-section of those affected by fish and wildlife management on federal public lands must be, in a reasonable and fair manner, afforded representation on regional advisory councils."

In ruling on the cross-claim of the Native Village of Venetie Tribal Government and others, the Court also invalidated the Secretaries' policy of a goal of a 70/30 (subsistence users/sport and commercial users) membership representation. The Court held that the Secretaries had failed to comply with the notice and comment provisions of the Administrative Procedure Act (5 U.S.C. 553) and ruled that the policy should have been put before the public for comment in a rulemaking process. The District Court ordered the Secretaries to conduct a rulemaking to promulgate an appropriate regional advisory council regulation consistent with FACA after compliance with 5 U.S.C. 553. The Secretaries initiated action with a proposed rule published on April 15, 2004 (69 FR 19964), and received testimony on the proposed rule at a May 2004 public hearing.

On October 14, 2004, the Secretaries published a final rule in the **Federal Register** (69 FR 60957). The Secretaries' underlying purpose in revising §__.11(b), while complying with the District Court's order, was to ensure continued compliance with both the fairly balanced representational requirements of FACA and the requirements and purposes of Title VIII of ANILCA in the appointments to the councils. In the change, the Secretaries recognized that some persons with interests other than subsistence uses are entitled under FACA to be represented on the councils. The Secretaries also recognized that Congress intended in Title VIII for Alaska residents "who have personal knowledge of local conditions and requirements * * * to have a meaningful role in the management of fish and wildlife and of subsistence uses on public lands in Alaska," and that Congress also intended that "large urban population centers" not be allowed to dominate the regional advisory council system. This rule established the 70/30 representational goal in the change to §__.11(b).

The Native Village of Venetie Tribal Government and others then challenged the final rule, and on August 8, 2006, the Court declared the 70/30 membership structure to be arbitrary and capricious because the Secretaries and the Board had failed to adequately explain the analysis of the relevant factors and to articulate their rationale in adopting the final rule. That order stated that "the court has not concluded that the 70/30 rule for regional advisory council membership is contrary to law. The court's holding is that defendants have not submitted to the court an administrative record that provides a rationale for that rule."

**Purpose of This Notice**

The purpose of this notice is to fulfill the requirements of the District Court's August 8, 2006, order: To lay out a full administrative record, display a complete assessment of alternatives considered, and provide a more complete explanation for the option selected for providing a balanced membership on the councils. In order to meet the requirements of the District Court, the Secretaries and Board chose to involve the public and the regional advisory councils in a further gathering of ideas and alternative methods to meet all the requirements for Council makeup. The first step of this process was to solicit written comments and suggestions from the public in a formal request dated October 12, 2006 (71 FR 60095). Those comments and suggestions were summarized and presented to the regional advisory councils during their February and March 2007 meetings. At those meetings, the councils were then provided the opportunity to make recommendations to the Federal Subsistence Board for its consideration. The Board was presented a packet of materials with the public comment, Council recommendations, and staff summaries. At a meeting on May 10, 2007, the Board considered two main options based on the packet of materials and additional testimony, including verbal recommendations of the council chairs or their designee. The Board selected one of those options, after deliberation, to recommend to the Secretaries. The Secretaries agree with that recommendation, as documented in this notice.

**Selection Process Explanation**

The councils must have a balanced membership in accordance with FACA and the court's rulings. This necessitates that qualified representatives from groups such as commercial users of fish and wildlife resources and sportsmen should sit as members of the councils. In order to implement that balanced membership, the Secretaries must have some method of identifying which interest or interests a prospective council member would represent. The Secretaries believe that self-identification by an applicant is the best way to obtain that information. Many individuals using the fish and wildlife resources of Alaska do so within different user groups. Subsistence fishermen frequently hold commercial fishing licenses, and commercial fishermen may also be sport fishermen or hunters. Sport hunters may have personal use fishing permits, and hunting guides may also hold sport fishing licenses. In almost all cases, however, an individual usually holds certain convictions and beliefs that would cause him or her to represent one of his or her interests more strongly than another interest when making recommendations on potential regulations or policies that would impact his or her use of the resource. For that reason, the Secretaries request that each applicant for a council identify a primary interest. In this way, the Secretaries can appoint applicants who would provide a balanced membership for each council.

Even though FACA requires a membership balanced in viewpoints, the purpose of the councils is to provide Alaska residents "who have personal knowledge of local conditions and requirements * * * to have a meaningful role in the management of fish and wildlife and of subsistence uses on public lands in Alaska" (ANILCA, Title VIII). The Secretaries believe that, in order to fulfill this mandate, subsistence interests must constitute a clear majority of members on each council. Likewise, since sport and commercial users are also entitled to be represented (where such qualified individuals may be present), a council composed of only subsistence users is not a council that meets the requirements of FACA when other qualified representation is available. The Secretaries and the Board, in promulgating the October 2004 rule, considered subsistence and sport and commercial membership ratios of 60/40, 70/30, 80/20, and 90/10 percent, respectively.

EXHIBIT 1
Page 2 of 5

The Secretaries did not adopt the 90/10 ratio, because a single individual on a 10-member council could not adequately represent both sport and commercial interests and could easily be intimidated by the remaining 90 percent of the council. Council meetings are routinely held in remote villages and some council members have difficulty attending meetings, particularly if they are engaged in harvesting fish or wildlife resources at the time or are unable to travel due to inclement weather. If such a situation happens to the single person representing sport and commercial users, then there would be no representation of those viewpoints. The Secretaries also rejected the 60/40 ratio. A council with a 60/40 ratio could easily be dominated by sport and commercial interests when one or two members representing subsistence interests are missing from the meeting. An obverse situation could exist with an 80/20 membership ratio if one of the sport or commercial representatives were absent. A 70/30 membership ratio provides a majority representation for subsistence users without domination by sport or commercial interests and still allows meaningful representation by sport and commercial interests. All council members are expected to examine each proposal, policy, or plan and contribute to the development of council recommendations based on recognized principles of fish and wildlife conservation, satisfaction of subsistence needs, and substantial evidence, consistent with Title VIII of ANILCA, and are not expected to act as single interest only representatives.

The councils were first constituted with a 70/30 membership representation goal before their winter 2004 meetings. Since then, the 10 councils have held at least 70 regularly scheduled meetings. In every instance, these meetings have occurred without rancor or hostility among represented interests. Many members have expressed gratitude for the opportunity to associate and learn from members representing other interests. The balanced councils are successful in part because persons representing the different interests depend on the same fish and wildlife resources, with conservation being the main concern.

**Summary of Comments From Federal Subsistence Regional Advisory Councils, Other Organizations, and the Public**

As previously described, the Federal Subsistence Board sought public comment on October 12, 2006 (71 FR 60095). The Board received written comments from the Alaska Department of Fish and Game (ADF&G) and the public, including two tribal agencies, one Native organization, one sport fishing and hunting organization, and seven private citizens. Assisted by summaries of that comment, the Federal Subsistence regional advisory councils considered council composition at their February and March 2007 meetings. At the Board's May 10, 2007 meeting, eight councils made formal recommendations and two councils chose not to make a recommendation but submitted comments to the Board. In total there were approximately 43 different recommendations centered around three basic themes. These were considered by the Board during its May 10, 2007 meeting. The recommendations and a response to those recommendations follow. The responses reflect the Secretaries' selected methodology for assuring balance in membership of the regional advisory councils.

**Comments Regarding Council Structure**

*Recommendations Regarding a Percentage Quota*

By a ratio of 2 to 1, the commenters and councils opposed setting a ratio of any kind. Their comments noted that: (1) The councils were created for subsistence users who otherwise have little say in the management of their resources; (2) since the purpose of the councils is for recommendations on subsistence management, councils should be composed of subsistence persons familiar with local uses and needs; (3) single-interest representation is not a realistic mirror of Alaskan resource users who are not neatly divided into groups.

Those who support designating a percentage of seats on each council for different user groups noted that: (1) The percentage should reflect each region's demographics, and (2) no less than 30 percent of council members should be commercial and sport use representatives and no more than 70 percent should be subsistence use representatives.

*Response:* The Secretaries conclude that using a ratio to fill council seats provides a process which clearly demonstrates their desire for diverse representation of users on the councils. The 70/30 ratio allows commercial and sport use representatives a meaningful participation on the councils while maintaining (and protecting) a majority voice for subsistence users. This ratio system of representation worked well during the years it was used. The ratio is a goal rather than an absolute requirement. The council member selection process is dependent on the applications received, and some regions do not have a sufficient number of resident commercial and sport use applicants to fill 30 percent of the seats. The Secretaries recognize that a majority of applicants do participate in commercial or sport and subsistence activities, and the Departments generally approve for appointment those applicants with the most comprehensive knowledge of resource uses. The Secretaries intend that at no time will selections be made with less than a 70/30 ratio, favoring subsistence representatives.

*Other Comments Regarding Council Structure*

Some commenters recommended amending ANILCA to exempt the councils from FACA and to conduct a formal rulemaking for the balanced membership plan, which would include public hearings and consultation with tribal governments that have an interest in this regulation.

*Response:* Amendments to ANILCA are beyond the scope of this notice. The Federal Subsistence Management Program has conducted a formal rulemaking concerning council membership, of which this notice is a part. The rule balances the requirements of FACA and ANILCA.

Other recommendations were to (1) Include designated seats for tribal members; (2) designate seats to be nominated by the governor, Federal Subsistence Board, and State fish and game advisory committees; (3) add State subsistence and personal use, and animal protectionists, to the categories represented; (4) create separate councils for hunting and fishing in each region to allow more commercial and sport representation.

*Response:* ANILCA Title VIII priorities are established for all rural residents of Alaska and do not provide preference based on ethnicity. Under current regulations, anyone may nominate members for the Secretaries' consideration. However, the Secretaries have always reserved for themselves the authority to make final appointments.

FACA requires diverse viewpoints to be represented on the councils, but also requires that the membership be balanced with the purpose of the councils, which is to provide a forum for interested persons to advise the Board regarding any matter pertaining to subsistence uses and needs. FACA also states that not all interested user groups or individuals can expect membership on a Federal advisory committee.

EXHIBIT 1
Page 3 of 5

**Recommendations Regarding the Member Appointment Process**

The commenters made recommendations related to the appointment process that are summarized as follows: (1) Expand outreach to diverse applicants; (2) revise applicant evaluation criteria to encourage diversity; (3) balance should also consider age, gender, ethnicity, income, education, geographic residence, and other factors; (4) require applicants to designate the interest group they feel most qualified to represent; and (5) maintain a contact list of various organizations, and contact each one regarding each applicant and verify with the community that the applicant would represent community resources use activities.

*Response:* Since inception of the councils, the Secretaries have considered age, gender, education, and geographic residence when making appointments. Beginning with the 2003 nomination cycle, the Board expanded outreach to commercial and sport use organizations, the application forms were modified to allow for self designation of user group representation, and the applicant evaluation criteria were modified to accommodate commercial and sport use representatives. The nominations process does include a thorough interview of the applicants, their references, and key regional contacts to determine whether applicants are qualified and able to represent their communities and regions.

**Recommendations Regarding Individual Member Criteria**

The commenters made recommendations related to membership evaluation criteria. Recommendations included: (1) Eliminate the requirement for all members to be knowledgeable about the subsistence uses of public lands in the region; (2) clearly identify the financial interests of members; (3) require all members to uphold ANILCA and protect subsistence uses; and (4) require all appointees to have a comprehensive understanding of Federal and State subsistence management systems, ANILCA, the user group issues, regional subsistence uses and areas, and *Robert's Rules of Order*.

*Response:* The requirement for all members to know subsistence uses is imbedded in ANILCA and can only be removed by Congress. ANILCA Title VIII and the implementing regulations require all council members to be residents of the region they serve, to have knowledge of that region, and to have knowledge of the subsistence uses of that region. This knowledge is necessary for the councils to fulfill their purpose. The Department of the Interior's ethics policy for its many advisory committee members neither requires nor encourages financial disclosure, but it does require disclosure of lawsuits, land use permits, and certain other interactions with Department agencies in which the member is a named party. All members are expected to work within the framework of Title VIII and to uphold the law. The applicant evaluation process seeks those with the most comprehensive knowledge of the region's resources and resource uses and leadership qualities and experience. New council members are provided orientation training and an operations manual, and all councils have staff provided to facilitate a free flow of information and assistance to all council members.

**Federal Subsistence Board Recommendation**

During the Federal Subsistence Board's public meeting on May 10, 2007, after reviewing staff reports, recommendations, and comments by the regional advisory councils, public comments, and public testimony presented during the meeting, the Board developed and considered two distinct options: (1) The first option would lead to councils composed of individuals who each hold a variety of viewpoints, and (2) the other option would provide a variety of viewpoints by a membership composed of distinct single-use representatives.

*Option 1.* Councils composed of individuals, each of whom holds a variety of viewpoints. This option would seat members who have a comprehensive knowledge of the subsistence, commercial, and sport uses within their respective regions.

In combination, the majority of commenters and councils preferred this option. Most past and current council members participate in multiple resource uses. These members were able to represent the multiple viewpoints of the resource uses within their regions and offer a comprehensive perspective.

*Option 2.* Provide a variety of viewpoints by a membership composed of distinct single-use representatives. This option would make the goal of seating a specific percentage of commercial and sport use representatives on the subsistence regional advisory councils.

Among councils and commenters that favor this option, the ratio most mentioned is a ratio of 70/30 subsistence to commercial and sport users. This option would clearly show that commercial and sport uses are represented on the councils. Councils and public commenters wanted the Board to consider that some regions have little or no commercial or sport use; therefore, the percentage ratio should remain a goal rather than establish designated seats. If no qualified commercial or sport use representatives apply in any given year, seats could then be filled by subsistence use representatives, and the percentage ratio goal would be sought with the next year's appointments.

After deliberation, the Board voted 6–0 on Option 2, to recommend to the Secretaries the final rule as published on October 14, 2004 (69 FR 60957).

**Secretarial Conclusion**

The Secretaries concur with the recommendation of the Federal Subsistence Board. In deciding on the option which uses percentages for council membership, the Secretaries jointly conclude that percentages would serve as a guide and not a requirement. It is understood that filling seats representing other user groups may be difficult, if not impossible, at all times in certain regions of the State. The Secretaries agree that defining specific seats by user groups could be a divisive factor if applied in a rigid context. However, recent experience has shown that communities can be unified by having additional viewpoints brought into the discussion and by providing a forum for competing interests to work together to find common ground. In addition, the designation of specific seats adds clarity to the overall management of the program and assists the Secretaries in their selection process.

The Secretaries concur that this notice expresses their view in choosing the 70/30 ratio over others such as 60/40 or 80/20; that the current council composition accomplishes their goal to include diverse viewpoints on the councils and balance the councils' knowledge with the councils' functions; that the 70/30 ratio, as previously implemented, was working well and that in many cases this ratio supported stronger, more defensible recommendations and helped to unify people on the issues at hand; and that the differing viewpoints of the diverse membership lead to better discussions. The Secretaries consider the 70/30 ratio as a guideline and understand that in some regions it may be difficult to achieve that ratio due to regional demographics.

EXHIBIT 1
Page 4 of 5

*Drafting Information*

Theo Matuskowitz drafted this notice under the guidance of Peter J. Probasco of the Office of Subsistence Management, Alaska Regional Office, U.S. Fish and Wildlife Service, Anchorage, Alaska. Charles Ardizzone, Alaska State Office, Bureau of Land Management; Sandy Rabinowitch and Nancy Swanton, Alaska Regional Office, National Park Service; Drs. Warren Eastland and Glenn Chen, Alaska Regional Office, Bureau of Indian Affairs; Jerry Berg and Carl Jack, Alaska Regional Office, U.S. Fish and Wildlife Service; and Steve Kessler, Alaska Regional Office, U.S. Forest Service, provided additional assistance.

**Authority:** 16 U.S.C. 3, 472, 551, 668dd, 3101–3126; 18 U.S.C. 3551–3586; 43 U.S.C. 1733.

Dated: April 3, 2008.

**P. Lynn Scarlett,**
*Deputy Secretary of the Interior, Department of the Interior.*

Dated: March 27, 2008.

**Mark Rey,**
*Under Secretary for Natural Resources and Environment, Department of Agriculture, Forest Service.*

[FR Doc. E8–7580 Filed 4–9–08; 8:45 am]
**BILLING CODE 3410–11–P, 4310–55–P**

---

**FEDERAL COMMUNICATIONS COMMISSION**

**47 CFR Part 54**

**[WC Docket No. 02–60, FCC 08–47]**

**Rural Health Care Support Mechanism**

**AGENCY:** Federal Communications Commission.
**ACTION:** Final rule; petition for reconsideration.

**SUMMARY:** In this document, the Commission grants American Telemedicine Association's (ATA) Petition for Reconsideration in part and extends for three years the Commission's prior determination to grandfather those health care providers who were eligible under the Commission's definition of "rural" prior to the *Second Report and Order*.
**DATES:** Effective May 12, 2008.
**FOR FURTHER INFORMATION CONTACT:** Thomas Buckley, Senior Deputy Chief or Erica Myers, Attorney, Wireline Competition Bureau, Telecommunications Access Policy Division at (202) 418–7400 (voice), (202) 418–0484 (TTY).
**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Order on Reconsideration*, in WC Docket No. 02–60, released February 14, 2008. The full text of this document is available for public inspection during regular business hours in the FCC Reference Center, Room CY–A257, 445 12th Street, SW., Washington, DC 20554.

**I. Introduction**

1. In this Order on Reconsideration, the Commission grants in part a Petition for Reconsideration by the American Telemedicine Association (ATA), seeking limited reconsideration of the Commission's Rural Health Care Support Mechanism *Second Report and Order*, 70 FR 6365, February 7, 2005. Specifically, the Commission grants ATA's Petition for Reconsideration in part and extends for three years the Commission's prior determination to grandfather those health care providers who were eligible under the Commission's definition of "rural" prior to the *Second Report and Order*.

**II. Discussion**

2. The Commission finds that it is in the public interest to grant ATA's Petition for Reconsideration in part and extends for three years the Commission's prior determination to grandfather those health care providers who were eligible to participate in the Commission's rural health care mechanism under the Commission's definition of "rural" prior to the *Second Report and Order*. Given the Commission's broad discretion to define the term "rural," the Commission also finds that it is within its authority to continue providing funding to those health care entities that were previously eligible under the Commission's definition of that term. In particular, the Commission finds it is premature to discontinue support at this time to those health care providers who were eligible under the definition of "rural" prior to the *Second Report and Order*. ATA and commenters proffered specific, uncontested evidence that the application of the new definition of rural in the *Second Report and Order* would result in specific harms to entities that previously were eligible for universal service rural health care support. For example, in its petition, ATA identifies multiple health care facilities that participate in telehealth communications networks in Nebraska and Montana that would be adversely affected by the loss in universal service rural health care funding if the new definition of rural were applied to their rural health care funding applications. This, in turn, would serve only to endanger the continued availability of telemedicine and telehealth services that these health care facilities provide. Indeed, the Coordinator for Telehealth Services at Avera St. Luke's Hospital in Aberdeen, South Dakota specifically commented that "if we lose USAC support of our telecommunication infrastructure[,] the impact on our facility, our community [of several hundred people], our region and our patients would be devastating. Telehealth Services, including extensive telemedicine, would face significant cuts if not termination." Additionally, the discussion of the term rural in this order relates only to the existing rural health care mechanism.

3. The Commission believes, as commenters suggest, that additional time is necessary for the Commission to evaluate the effect of the new definition on health care providers before they lose support as a result of the modified definition of rural adopted in the *Second Report and Order* became effective in March 2005. Only two funding years have concluded since the new definition went into effect. It would be premature for the Commission to remove previously eligible entities from the mechanism after this limited amount of time, particularly when (as described below) there remains sufficient available funding. Further, in November 2007, the Commission released the *Universal Service Rural Health Care Pilot Program Selection Order*, 22 FR 20360, November 19, 2007, which selected 69 organizations to participate in the Rural Health Care Pilot Program (Pilot Program), initiated by the Commission in September 2006, to facilitate the creation of a nationwide broadband network dedicated to health care, connecting public and private non-profit health care providers in rural and urban locations. A goal of the Pilot Program is to provide the Commission with a more complete and practical understanding of how to ensure the best use of the available RHC support mechanism funds to support a broadband, nationwide health care network (expressly including rural areas). Upon completion of the Pilot Program, among other things, the Commission intends to use the information it learns to fundamentally reexamine the entire universal service rural health care mechanism. In particular, the Commission intends to issue a report detailing the results of the Pilot Program and the status of the RHC support mechanism generally, and to recommend any changes necessary to improve the existing RHC program. In addition, the Commission intends to incorporate the information it gathers as part of the Pilot Program into the record

EXHIBIT _1_
Page _5_ of _5_